Fannie Mae **TILLMAN**, Plaintiff,

v.

**HOLY CROSS HOSPITAL**, Defendants.

No. 84–6379–Civ.

United States District Court,
S.D. Florida.

March 31, 1987.

Fannie Mae Tillman, Fort Lauderdale, Fla., for plaintiff.

Muller, Mintz, Kornreich, Caldwell, Casey, Crosland, and Bramnick, John D. Gronda, David V. Kornreich, Miami, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOEVELER, District Judge.

THIS CAUSE came on for trial before the Court, without a jury. Evidence was presented and arguments were held on February 3 and 4, 1987, and the Court now presents Findings of Fact and Conclusions of Law. The Plaintiff is a *pro se* complainant. This suit is an individual action seeking back pay, reinstatement, and other relief for alleged unlawful employment practices (race discrimination) committed by Defendant in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* [hereinafter referred to as Title VII]. Plaintiff, a former employee of the Defendant, claims that she was terminated because of her race in violation of Title VII.

After consideration of the testimony, the exhibits, the parties' arguments, the comprehensive Pre–Trial Stipulation, and the applicable law, the Court hereby makes and enters its Findings of Fact and Conclusions of Law in accordance with Rule 52, Federal Rules of Civil Procedure. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. Conversely, to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

## FINDINGS OF FACT

1. The Plaintiff, FANNIE MAE TILLMAN, is a Black citizen of the United States and a resident of Broward County, Florida.

2. The Defendant, HOLY CROSS HOSPITAL, is a private, non-profit hospital doing business in the Southern District of Florida. At all times relevant to the instant action, the Defendant has employed, and does now employ, more than fifteen (15) persons.

3. Plaintiff was first employed by Defendant on March 1, 1971, as a nursing assistant. Plaintiff worked in the Nursing Services Department.

4. On or about September 30, 1978, Plaintiff sustained an on-the-job injury to her back which rendered her unable to perform the duties of a nursing assistant. Plaintiff was out of work and receiving workers' compensation benefits for approximately two (2) years after her injury.

5. In late 1980, Plaintiff enrolled in a course at Cypress Hospital in order to be trained as a unit secretary. Plaintiff was advised of the course, and assisted in enrollment, by Dr. Gloria Heffernan, Defendant's Employee Health Physician (race: white).

6. At the time Plaintiff was completing her unit secretary courses, the Defendant's Administrative Director of Nursing Services was Ms. Eileen J. Fleese (race: white). She learned that Plaintiff was being retrained, and invited Plaintiff to return to work for Defendant as a unit secretary within the Nursing Services Department. Plaintiff accepted Fleese's offer and on or about February 16, 1981, she returned to work for Defendant, as a unit secretary.

7. The unit secretary position is essential to the efficient operation of any nursing unit. Nurses rely very heavily upon the unit secretary for providing such vital services as acting as receptionist for the nursing unit; initiating and receiving communications via telephone, pneumatic tube and computer system; assembling new charts, records and clinical information; transcribing diagnostic orders via computer C.R.T.; ordering and maintaining supplies for nursing unit; making telephone calls to doctors; relaying patient information; and running errands at the request of doctors and/or nurses.

8. Pursuant to Defendant's policy, Plaintiff's performance as a unit secretary was evaluated by Ms. Pamela Telfair (race: black) who, at that time, had supervisory authority over all of Defendant's unit secretaries. The Plaintiff's first evaluation was prepared in May of 1981 and the next

in August of 1981. Plaintiff's rating on the second evaluation was lower than on the first; Plaintiff's poor attendance caused the lower rating.

9. On or about June 13, 1982, Plaintiff was assigned by Eileen Fleese to be the unit secretary in the Intensive Care Unit (ICU) on the 3:00 p.m. to 11:00 p.m. shift. Jane Hindman (race: white) and Pamela Telfair jointly recommended to Fleese that Plaintiff be assigned to the ICU.

10. The Intensive Care Unit (ICU) is a unit comprised of extremely ill medical and surgical patients. Up to nine patients at a time can be treated in the ICU. The ICU, Coronary Unit (CCU) and the Intermediate Care Unit (IMC) are collectively referred to as the Critical Care Units.

11. Because of the emergency nature of the services provided by nurses in the ICU, the job of unit secretary is even more vital than in general medical/surgical units. The ICU's unit secretary must be dependable and follow through on all orders issued by doctors and nurses. The unit secretary must be at her work station at all times and must be ready to immediately respond to an emergency situation.

12. Hazel Harkins (race: white) was the Head Nurse of the ICU at the time the Plaintiff was assigned as the unit secretary. She (Harkins) held that position from April 2, 1978 until her death on April 17, 1986. Harkins worked in the ICU on the 7:00 a.m. to 3:00 p.m. shift. During the two (2) shifts when Harkins was not on duty, an Assistant Head Nurse (sometimes referred to as the Charge Nurse) was in charge of the ICU and was responsible for supervising all unit employees, including the unit secretary.

13. When Plaintiff was first transferred to the ICU, Mr. Steven Kling (race: white) was the Assistant Head Nurse. On or about August 9, 1982, Ms. Debbie Coan (race: white) was transferred to the ICU on the 3:00 p.m. to 11:00 p.m. shift as the Assistant Head Nurse. Coan was, therefore, Plaintiff's immediate supervisor. Coan worked in the ICU until September 1, 1984.

14. Debbie Coan had worked in the intensive care unit at Jackson Memorial Hospital in Miami prior to this assignment. She had also completed an extensive course on providing critical care. The nurses who staffed the ICU on Coan's shift had received proper critical care training, but had not actually worked in the ICU before.

15. Ms. Coan insisted that her staff strictly adhere to her policies. Upon becoming Assistant Head Nurse in the ICU, she immediately implemented and announced certain work procedures and she demanded strict compliance to those procedures by her subordinates. The evidence indicates Plaintiff's work performance continually fell below the standards expected of her by Coan. She (Coan) frequently counseled Plaintiff in an effort to force her to improve her performance.

16. Coan testified that she treated Plaintiff no differently than she treated white nurses who did not conform to her procedures. Coan stated she counseled all nurses who did not strictly live up to her standards. In fact, after counseling, Coan issued a written reprimand to nurse Marianne Parisio (race: white) for having a poor attitude.

17. On or about October 27, 1982, Plaintiff was counseled by Hazel Harkins for falsifying her time records. Pursuant to Defendant's policy for recording the hours worked by employees for payroll purposes, employees were responsible for recording their own time worked. Harkins testified on deposition that she accused Plaintiff of falsifying her time records by claiming entitlement to overtime pay, by indicating on her time sheet that she worked through her lunch period when, in fact, she did not. Harkins also accused Plaintiff of knowingly making false entries on her time sheet as to her actual starting and quitting time.

18. During the October, 1982 counseling session, Harkins also told Plaintiff that her attendance record as a unit secretary in the ICU was poor. Harkins accused Plaintiff of reporting for work after her scheduled starting time and also frequently leaving work before her shift was scheduled to end. Further, Plaintiff was counseled for

a pattern of leaving her work station without advising Coan (or anyone else) where she was going. Harkins stated she advised Plaintiff that this unauthorized absence from work was a serious breach of work rules and caused substantial hardship on the ICU nurses who frequently were required to perform the unit secretary duties in Plaintiff's absence.

19. Harkins considered the Plaintiff's actions to be serious offenses. She thus warned Plaintiff that she would be transferred unless she corrected her deficiencies. Plaintiff was also counseled about these matters by Nursing Supervisor Judy Smith (race: asian). These counseling sessions were memorialized on an Employee Counseling Report Form, which became part of Plaintiff's official personnel file.

20. Plaintiff admitted that she is the only one of Defendant's employees who has been accused of falsifying his/her time records. Ms. Harkins testified Plaintiff's race had no bearing on her decision to issue a written warning to Plaintiff.

21. Defendant's rules and regulations are commonly referred to as its Standard Practice Manual. Those rules and regulations contain an internal grievance procedure. Plaintiff did not file a grievance over the counseling and/or the issuance of the Employee Counseling Report Form.

22. In early 1983, several of the registered nurses who worked on the 3:00 p.m. to 11:00 p.m. shift in the ICU, and other nurses who occasionally worked overtime on that shift, orally complained to their head nurse, Hazel Harkins, about Plaintiff's poor attendance, bad attitude and performance problems. Finally, she advised those nurses to reduce their complaints to writing. Handwritten complaints were then provided in March of 1983 by registered nurses Kim Phillips, Sue Brownell, Susan Kelleher, Qui Lan, Marianne Parisio, and Debbie Coan. Some nurses filed more than one written complaint.

23. Testimony from several of these nurses established that Plaintiff often refused to carry out proper instructions from nurses during emergency situations. Thus, Plaintiff refused a nurse's order to schedule an X-ray test on a patient who was in respiratory arrest until the nurse asked Plaintiff to do so by saying "the magic word"—please. Also, on another occasion, Plaintiff refused to take samples to the laboratory to be analyzed. Testimony also established that, on one occasion, Plaintiff refused to leave the unit in order to retrieve blood for a patient who needed it, according to the nurse, in a "life or death" situation.

24. Plaintiff never had a confrontation with any of the nurses who made complaints against her. In fact, she considered them to be her friends. No evidence was offered to suggest that the nurses ever made any racial comments about Plaintiff or other blacks. It does not appear from the evidence that Plaintiff's race was the reason they complained about her.

25. Plaintiff claimed that Coan made a statement in her presence that "I will be glad when the unit becomes one color." Plaintiff further claims that the statement was a reference to her race. However, based upon the credible testimony of a nurse who was present when Coan made her statement, the Court finds that Coan was referring to the painting of the ICU (which formerly was multicolored) which was being done at the time the statement was made. The evidence supports the finding that Coan's statement was not directed to Plaintiff and was not a reference to her race.

26. Upon receiving the written complaints against Plaintiff, Nurse Harkins conferred with Eileen Fleese in order to bring Plaintiff's deficiencies to her (Fleese's) attention. Harkins advised Fleese of the circumstances surrounding Plaintiff's October 27, 1982 written reprimand, that Plaintiff was continuing to engage in the conduct for which she was originally reprimanded, and of the existence and nature of the numerous verbal and written complaints that she received from the ICU nurses about the Plaintiff.

27. Eileen Fleese was quite disturbed about Harkin's report. She directed Harkins to draft a memorandum summarizing their conversation and to include her rec-

ommendation as to what disciplinary action should be taken against Plaintiff.

28. Harkins testified she rarely took formal disciplinary action against her subordinates. She preferred to verbally counsel employees. As everyone in the nursing units was considered to be professional, such verbal counseling was almost always effective. The written warning and memorandum Harkins prepared on Plaintiff at Fleese's direction was considered by Harkins to be a serious form of discipline.

29. Harkins did not recommend that Plaintiff be discharged. She recommended to Fleese that "Fannie be transferred to another unit as she is not doing her job here." Before Fleese could take action against Plaintiff, she (Fleese) experienced severe medical problems. She was hospitalized and did not return to work until late June of 1983.

30. On or about April 24, 1983, Plaintiff summoned Barbara Callaway (race: white), Assistant Director of Nursing for the 3:00 p.m. to 11:00 p.m. shift, to the ICU for a meeting. Plaintiff, who was extremely agitated, referred to Coan as a "witch," and complained to Callaway that Coan was speaking to her in an improper manner. Plaintiff, however, admits that Coan's manner of addressing Plaintiff was no different than the way she spoke to (white) nurses. Further, Plaintiff did not claim that Coan's conduct was based in any way on her (Plaintiff's) race. Callaway discussed Plaintiff's complaints with Coan and then Callaway advised Coan and Plaintiff that, in her opinion, they had a personality conflict which was interfering with their work. Callaway offered to allow Plaintiff to transfer to another unit, assuming that the stress of the ICU could have caused her problem. Plaintiff refused that offer.

31. During Fleese's extended illness, Rebecca Walker (race: black) was the acting department head. Walker was made aware of the April 24th meeting by a nurse who was in charge of the staffing office. It was rare for a high-level supervisor like Callaway to report to a unit in order to resolve a dispute between a charge nurse and a member of her staff. Thus, Walker directed Callaway to prepare a memorandum summarizing the meeting.

32. Upon receiving Callaway's memorandum, Walker conducted a thorough investigation into the matter. She spoke to Plaintiff, Coan and Mrs. Loy (another supervisor). When Walker discussed the matter with Harkins, she (Walker) was informed of Harkins' April 11th memorandum and of the fact that Fleese had previously discussed the memorandum with Harkins. Walker reviewed the April 11th memorandum. She did not know that Fleese was hospitalized before she had the opportunity to act on it. Upon completion of her investigation, Walker discussed her findings with Plaintiff. Walker discussed the charges and complaints against Plaintiff item by item.

33. Plaintiff admitted to Walker that she was guilty of certain of the charges made against her. However, she denied most of the charges. Plaintiff attempted to convince Walker that she was the only person in the ICU who knew their job and that everyone else was at fault. The conversation between Plaintiff and Walker took place in Walker's office; no one else was present. The evidence discloses that Plaintiff never mentioned race and did not complain to Walker that she was being picked on because she was black.

34. Walker spoke to Coan and the other nurses working the 3:00 p.m. to 11:00 p.m. shift in the ICU and asked if they would give Plaintiff a "last chance." It was agreed that Plaintiff could remain in the ICU only if she immediately improved her performance. Walker discussed with Plaintiff each of her deficiencies and advised Plaintiff that she could remain in the ICU only if she corrected them immediately.

35. In May of 1983, Plaintiff received her annual performance evaluation, which had been prepared by Hazel Harkins. Plaintiff was evaluated as unsatisfactory in five (5) of seven (7) categories. Harkins' reason for her rating(s) of Plaintiff was that Plaintiff was on probation due to her poor performance, that she refused to obey orders from nurses, and that she was un-

cooperative. The evidence supports Defendant's position that Plaintiff's race played no role in the poor evaluation.

36. On or about June 30, 1983, Eileen Fleese, who had just returned to work from an extended illness, met with Plaintiff concerning Harkins' April 11, 1983 recommendation to transfer Plaintiff to another nursing unit. At that time, Fleese was not aware of the April 24th confrontation between Coan and Plaintiff, nor of the fact that Rebecca Walker had counseled Plaintiff. During the June 30th meeting, Fleese discussed Harkins' April 11th memorandum with Plaintiff. She discussed Plaintiff's deficiencies item by item. Then, Fleese told Plaintiff that, based upon Harkins' recommendation, she would be transferred immediately.

37. Fleese transferred Plaintiff to the unit secretary position on "3–West," a fifty-six (56) bed medical surgical unit, effective on July 4, 1983. Plaintiff was still assigned to the 3:00 p.m. to 11:00 p.m. shift. Plaintiff's supervisor was Assistant Head Nurse Layna Harper (race: white).

38. It appears plaintiff was angry that she had been transferred from the ICU. Plaintiff remarked to Harper that she intended to be reassigned to the ICU as the unit secretary. Harper frequently complained to her supervisor, Virginia Gerry (now deceased), that Plaintiff repeatedly left her work station without permission.

39. At approximately 3:30 p.m. on July 27, 1983, Plaintiff, without permission, left her work station and went to the ICU (which was located on another floor in the Hospital). Although Plaintiff denies "bringing papers" to the ICU, a preponderance of credible record evidence shows that Plaintiff took a copy of her performance evaluation with her to the ICU. The evidence further indicates Plaintiff handed the evaluation to Coan and demanded she read it. After a brief conversation, Plaintiff became hostile and Coan attempted to end the discussion. At that point, Plaintiff stated to Coan "you are going to pay— someday when you least expect it, you are going to pay." Plaintiff acknowledged to Coan that her statement was intended to be a threat.

40. Immediately after her conversation with Plaintiff, Coan called Fleese and reported that Plaintiff had threatened her. Fleese immediately dispatched a nursing supervisor and a security guard to the ICU. Plaintiff had already left the ICU and returned to 3–West before they arrived.

41. Fleese immediately called Layna Harper on 3–West and instructed her to direct Plaintiff to her office as soon as possible. In the presence of Mrs. Virginia Gerry, Nursing Supervisor (now deceased) Fleese confronted Plaintiff with the charges made by Coan. Despite Plaintiff's denial at trial, a preponderance of credible record evidence shows that Plaintiff admitted to Fleese that she left 3–West without permission. She further claimed that she was extremely upset and that she could not recall threatening Ms. Coan. At the conclusion of the meeting, Fleese determined that the incident warranted severe disciplinary action, and possibly termination. Fleese thus prepared a Notice of Disciplinary Action which suspended Plaintiff pending a detailed review of the matter. Pursuant to Defendant's policy, before Fleese could terminate Plaintiff, she was required to confer with James G. Stevens (race: white), (then) Director of Human Resources.

42. Fleese and Stevens discussed Coan's charges against Plaintiff. They reviewed her work record as a unit secretary and the events discussed above. Both Stevens and Fleese agreed that Plaintiff's termination was warranted.

43. Stevens testified that he had developed a "cardinal rule" that no employee would be permitted to: (1) steal from patients; or (2) threaten a supervisor. Thus, although Stevens reviewed Plaintiff's entire performance record, once he determined that she had threatened Coan, Plaintiff's termination was indicated. Plaintiff's race played no role in Stevens' decision to fire Plaintiff.

44. On August 1, 1983, Fleese wrote to Plaintiff, stating that she had been discharged for leaving her work station with-

out permission and for threatening a charge nurse. Plaintiff did not file a grievance regarding her termination. Plaintiff is the only one of Defendant's employees who has been charged with leaving his/her work station without permission and with threatening a supervisor.

45. On or about September 29, 1983, Plaintiff filed simultaneously, a charge of discrimination with the Equal Employment Opportunity Commission (hereinafter the EEOC) (Charge No. 046832539) and with the Broward County Human Relations Division (Case No. EM–286–9–83). The charge was deferred to the Human Relations Division for investigation. On December 23, 1983, after a thorough investigation, the Director of Broward County's Human Relations Division issued a Determination wherein it was concluded that there was insufficient evidence to find that Defendant was guilty of employment discrimination. On January 30, 1984, the EEOC issued a Determination, concluding that there was no reasonable cause to believe that Plaintiff's charge was true. A Notice of Right to Sue was issued to Plaintiff on January 30, 1984. The complaint in the instant action was filed on April 16, 1984. It was not, however, served until on or about December 23, 1985.

46. Plaintiff has failed to establish by competent, credible evidence that she was discriminated against because of her race. Plaintiff presented no persuasive evidence of any disparate treatment towards her because she is black. Further, she presented no evidence that any other person employed by Defendant had been charged with the same or similar offense(s), or that Defendant practiced discrimination in its treatment of employees of any color.

47. The Plaintiff failed to carry her burden of demonstrating, by the greater weight of the evidence, a prima facie case that her discharge was in any way related to her race. Indeed, the weight of the evidence supports the conclusion that her discharge was justified because of her conduct as previously set forth, culminating in the confrontation with Ms. Coan on July 27, 1983.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter of this action and the parties herein pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343. All procedural prerequisites for suit under Title VII have been properly fulfilled by Plaintiff.

2. The Defendant is an employer within the meaning of 42 U.S.C. § 2000e, *et seq.*, and Plaintiff is an employee within the meaning of 42 U.S.C. § 2000e, *et seq.*

3. Plaintiff's claim under Title VII is limited by 42 U.S.C. § 2000e–5(f)(3) to the date 180 days prior to the filing of her unfair employment practice charge with the EEOC.

4. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the United States Supreme Court established a three-part test setting forth the burden of proof for a plaintiff alleging discriminatory treatment ("disparate treatment").

5. When alleging disparate treatment in a discharge case, the Plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. This requires a showing that: (a) Plaintiff is a member of a protected class (Black); (b) Plaintiff was qualified for the position and/or satisfactorily performed the duties of the position; (c) Plaintiff was in fact discharged; and (d) Plaintiff was treated differently by Defendant than employees that are not members of her protected class under similar circumstances. *Lee v. Russell County Board of Education*, 684 F.2d 769, 773 (11th Cir.1982).

6. Once Plaintiff has proven a *prima facie* case, the burden shifts to the Defendant to articulate some legitimate, nondiscriminatory reason for its employment decision. The Defendant's burden is one of production, not of proof. The Defendant

need only present evidence that the Plaintiff was discharged for a legitimate, nondiscriminatory reason. It is sufficient if the Defendant raises a genuine issue of fact as to whether it discriminated against the Plaintiff. *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983); *Lee v. Russell County Board of Education*, 684 F.2d 769, 773 (11th Cir. 1982).

7. Once Defendant has articulated some legitimate, nondiscriminatory reason for its employment decision, the burden of proof shifts to the Plaintiff to prove that the Defendant's articulated reason is a pretext. The required showing of pretext consists of proof by a preponderance of evidence "that the legitimate reasons offered by Defendant were not its true reasons, but were a pretext for discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

8. The ultimate burden of persuading the trier of fact that the Defendant intentionally discriminated against the Plaintiff remains at all times with the Plaintiff. *Texas Department of Community of Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

9. As stated before, the Court finds that Plaintiff failed to carry her burden of proving a *prima facie* case of race discrimination with respect to her discharge. A preponderance of record evidence reveals that Plaintiff did not, after her return to the hospital, satisfactorily perform the job duties of a Unit Secretary. The evidence suggests that she had the ability to do so, but simply did not. Further, plaintiff produced no evidence of any disparate treatment of her as a Black. Additionally, she produced no evidence to show any discriminatory practices by Defendant.

10. Even assuming that Plaintiff has proven her *prima facie* case, Defendant has come forward with an abundance of evidence which demonstrates that Plaintiff was discharged for legitimate, non-discriminatory reasons. The record clearly demonstrates that Plaintiff was terminated for poor performance, leaving her work station without permission and for threatening a supervisor. In fact, termination for threatening a supervisor was called for under Defendant's policies.

11. The Court finds and concludes that, based upon competent and credible evidence presented by Defendant at trial, Defendant did have legitimate and non-discriminatory reasons to discharge Plaintiff.

12. Plaintiff has failed to prove that Defendant's articulated reasons for firing her were pretextual. In this regard, Plaintiff failed to produce any evidence, let alone proof by a preponderance of the evidence, that the reasons for discharge articulated by Defendant were merely a pretext for discrimination. The single instance of alleged discrimination (Ms. Coan's remark regarding making the place one color) related, the Court finds, to the painting going on at the time.

13. Plaintiff has not proven by a preponderance of the evidence that Defendant violated Title VII.

14. At the conclusion of the Plaintiff's case in chief, Defendant moved for involuntary dismissal pursuant to Rule 41(b), Federal Rules of Civil Procedure. The Court took the motion under advisement. In light of the instant ruling, Defendant's motion is now moot.

15. Costs shall be taxed in favor of the Defendant and against the Plaintiff. Rule 54(d), Federal Rules of Civil Procedure.

16. Under Title VII, the Court has the discretion to award the prevailing party attorney's fees as part of its costs. Because of the absence of evidence of discrimination in this cause, an award of attorneys fees might well be justified. The Court cannot conclude, however, that plaintiff recognized she was bringing a frivolous and malicious claim. She could not secure counsel and while this, perhaps, should have said something to her, I do not conclude that her motive was harrassment or revenge. While even good faith may not prevent an award of fees in an appropriate case, the Court, because of the total circumstances presented, will not award fees in this cause.

17. Judgment for Defendant will be entered by the Court in accordance with the foregoing Findings of Fact and Conclusions of Law.

DONE AND ORDERED.